10-3429-cv, 11-127-cv
BMI v. DMX, ASCAP v. THP Capstar

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2011

(Argued: June 16, 2011          Decided: June 13, 2012)

Docket Nos. 10-3429-cv, 11-127-cv

———————————

BROADCAST MUSIC, INC.,

*Petitioner-Appellant,*

v.

DMX INC.,

*Respondent-Appellee.*

———————————

UNITED STATES OF AMERICA,

*Plaintiff,*

AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS,

*Defendant-Appellant,*

v.

THP CAPSTAR ACQUISITION CORP., NOW KNOWN AS DMX, INC.,

*Applicant-Appellee.*

———————————

Before:
        PARKER, CHIN, and LOHIER, *Circuit Judges.*

Appeals from judgments of the United States District Court for the Southern District of New York (Louis L. Stanton and Denise Cote, *JJ.*) setting licensing fees, pursuant to antitrust consent decrees, for the public performance of copyrighted music.

AFFIRMED.

---

SETH P. WAXMAN (Jonathan E. Nuechterlein, Catherine M.A. Carroll, Eric F. Citron, *on the brief*), Wilmer Cutler Pickering Hale and Dorr LLP, Washington, District of Columbia; Marvin L. Berenson, Joseph J. DiMona, Broadcast Music, Inc., New York, New York, *for Broadcast Music, Inc.*

THEODORE B. OLSON (Amir C. Tayrani, Dace C. Martinez, Jennifer L. Conn, *on the brief*), Gibson, Dunn & Crutcher LLP, Washington, District of Columbia; Joan M. McGivern, Richard H. Reimer, Samuel Mosenkis, ASCAP, New York, New York; Christopher J. Glancy, I. Fred Koenigsberg, Stefan M. Mentzer, White & Case LLP, New York, New York, *for American Society of Composers, Authors and Publishers.*

R. BRUCE RICH (Benjamin E. Marks, Todd D. Larson, *on the brief*), Weil, Gotshal & Manges LLP, New York, New York; Christopher S. Harrison, Christopher

Harrison, PLLC, Austin, Texas, *for DMX, Inc.*

Christine A. Varney, Assistant Attorney General; Robert B. Nicholson, Robert J. Wiggers, Daniel McCuaig, Matthew J. Bester, Attorneys, U.S. Department of Justice, Washington, District of Columbia, *for Amicus Curiae United States in BMI v. DMX, Inc.*

Christopher J. Glancy, I. Fred Koenigsberg, Stefan M. Mentzer, Scott E. Hershman, White & Case LLP, New York, New York; Joan M. McGivern, Richard H. Reimer, ASCAP, New York, New York; Catherine E. Stetson, Hogan Lovells US LLP, Washington, District of Columbia; Ira M. Feinberg, Hogan Lovells US LLP, New York, New York, *for Amicus Curiae American Society of Composers, Authors and Publishers in BMI v. DMX, Inc.*

Bruce G. Joseph, Wiley Rein LLP, Washington, District of Columbia, *for Amici Curiae Television Music License Committee, LLC, et al. in ASCAP v. DMX, Inc.*

Robert B. Nicholson, Robert J. Wiggers, Daniel McCuaig, Matthew J. Bester, Attorneys, U.S. Department of Justice, Washington, District of Columbia, *for Amicus Curiae United States in ASCAP v. DMX, Inc.*

-3-

CHIN, *Circuit Judge*:

In 1941, the United States brought an antitrust action against the American Society of Composers, Authors and Publishers ("ASCAP"). The suit resulted in a consent decree that provided certain protections for prospective music licensees. Where, for example, ASCAP and a prospective licensee have reached an impasse over fees, under the consent decree, either may petition the United States District Court for the Southern District of New York to set a "reasonable" licensing fee. In 1966, the United States entered into a similar antitrust consent decree with Broadcast Music, Inc. ("BMI").

In these parallel cases, separate petitions were filed in the Southern District of New York requesting the court to set a "reasonable" rate after ASCAP and BMI were unable to agree on licensing fees with DMX, Inc. ("DMX"), a provider of background/foreground music ("BG/FG music"). In both cases, the district court (Louis L. Stanton, *J.*, in *BMI* and Denise Cote, *J.*, in *ASCAP*) adopted DMX's proposals. BMI and ASCAP appeal. We affirm.

-4-

### BACKGROUND

**1.    *The Facts*[1]**

**a.    *ASCAP and BMI***

ASCAP and BMI are "performing-rights organizations" ("PROs").  *See generally BMI v. CBS*, 441 U.S. 1, 4-5 (1979) ("*CBS*").  ASCAP was created in 1914 by music creators and publishers as an unincorporated membership association.  BMI was founded by broadcasters in 1939.  Each represents hundreds of thousands of songwriters, composers, and publishers who hold copyrights in millions of musical works.  They negotiate, implement, and enforce agreements with licensees that grant the right to perform their members' copyrighted songs.  They collect license fees and remit royalties to the copyright holders.  Together, ASCAP and BMI license the music performance rights to most domestic copyrighted music in the United States.  *See id.* at 5.[2]  ASCAP and BMI have traditionally offered "blanket

---

[1]    The facts are largely undisputed and drawn primarily from the trial record and district court opinions.

[2]    SESAC, Inc. ("SESAC") is a third, substantially smaller, PRO.  *See In re Application of MobiTV, Inc.*, 712 F.

licenses," or licenses that grant access to a PRO's entire repertory in exchange for a flat annual fee unaffected by the extent to which its music is performed.

In 1941 and 1964, the United States filed separate antitrust complaints against ASCAP and BMI for unlawfully monopolizing the licensing of performing rights. *See United States v. BMI*, 275 F.3d 168, 171-72 (2d Cir. 2001) ("*AEI*"). The government alleged, *inter alia*, that ASCAP and BMI's blanket licenses, the only type of license offered when the suits were brought, constituted "an illegal restraint of trade[,] and that arbitrary prices were being charged as the result of an illegal copyright pool." *CBS*, 441 U.S. at 10. The government sought to enjoin ASCAP and BMI's exclusive licensing powers and require them to offer different forms of licensing. *Id.* at 10-11. Settlement of these complaints led to the entry of two separate, but largely similar, consent decrees that continue to "substantially control[]" ASCAP and BMI's licensing practices, *id.* at 11, and minimize the "danger of unreasonable activity" caused by ASCAP and

Supp. 2d 206, 211-12 (S.D.N.Y. 2010).

-6-

BMI's market power, *K-91, Inc. v. Gershwin Pub. Corp.*, 372 F.2d 1, 4 (9th Cir. 1967). *See United States v. ASCAP*, 1940-43 Trade Cas. (CCH) ¶ 56,104 (S.D.N.Y. 1941), *amended*, No. Civ.A. 42-245, 1950 WL 42273, 1950-51 Trade Cas. (CCH) ¶ 62,595 (S.D.N.Y. July 17, 1950) ("ASCAP Decree"); *United States v. BMI*, 1966 Trade Cas. (CCH) ¶ 71,941 (S.D.N.Y. 1966), *amended*, No. 64-CV-3787, 1994 WL 901652, 1996-1 Trade Cas. (CCH) ¶ 71,378 (S.D.N.Y. Nov. 18, 1994) ("BMI Decree").

In 2001, ASCAP and the government agreed to a new consent decree, the Second Amended Final Judgment (the "AFJ2"). *See United States v. ASCAP*, No. 41-1395, 2001 WL 1589999, 2001-02 Trade Cas. (CCH) ¶ 73,474 (S.D.N.Y. June 11, 2001). The AFJ2 defines four types of licenses: blanket licenses, per-program licenses, per-segment licenses, and through-to-the-audience licenses. *See* AFJ2, §§ II(E), (J), (K), (S).[3]

---

[3]    Section II of the AFJ2 ("Definitions") defines the following licenses:

(E) "Blanket License" means a non-exclusive license that authorizes a music user to perform ASCAP music, the fee for which does not vary depending on the extent to which the music user in fact performs ASCAP music.

-7-

Both the AFJ2 and the BMI Decree include a "rate court" mechanism under which the United States District Court for the Southern District of New York has jurisdiction to determine reasonable license fees when the parties to a licensing transaction are unable to reach agreement.  *See* AFJ2, § IX(A); BMI Decree, § XIV(A); *see also infra* note 13.

### b.  *DMX*

DMX, formerly known as THP Capstar Acquisition Corp., is a leading commercial music service provider.  It

---

(J) "Per-program license" means a non-exclusive license that authorizes a broadcaster to perform ASCAP music in all of the broadcaster's programs, the fee for which varies depending upon which programs contain ASCAP music not otherwise licensed for public performance;

(K) "Per-segment license" means a non-exclusive license that authorizes a music user to perform any or all works in the ASCAP repertory in all segments of the music user's activities in a single industry, the fee for which varies depending upon which segments contain ASCAP music not otherwise licensed for public performance.

(S) "Through-to-the-Audience License" means a license that authorizes the simultaneous or so-called 'delayed' performances of ASCAP music that are contained in content transmitted or delivered by a music user to another music user with whom the licensee has an economic relationship relating to that content[.]

AFJ2, §§ II(E), (J), (K), (S).

was formed on June 3, 2005. It supplies BG/FG music to thousands of locations, including restaurants, shopping centers, hotels, retail stores, and similar public venues.[4] DMX does not offer particular songs; rather, DMX music designers select songs based on the general genre and feel of a particular program. DMX typically delivers or uses approximately 150,000 of its available musical compositions each year. These works are owned or controlled by more than 14,000 different publishers.

DMX provides music programming to its customers through "off-premise" and "on-premise" delivery mechanisms. Off-premise delivery involves the transmission of music to customers via direct broadcast satellite signals to the establishment's sound system. On-premise delivery involves the on-site transmission of music to customers through a

---

[4]     Under the AFJ2, BG/FG music service is defined as:  a service "that transmits performances of music to subscribers and that furnishes to those subscribers equipment not otherwise available to the general public that enables subscribers to make the transmitted performances on their premises. A [BG/FG] music service does not include radio or television stations or networks, cable television networks or systems, persons that transmit renditions of music to private homes, apartments, or hotel or motel guest rooms, or persons that transmit renditions of music to subscribers that charge admission."  AFJ2, § II(D).

proprietary DMX device that is installed at the customer location. Both off- and on-premise DMX customers have access to a wide array of programming. DMX's off-premise data reflects the frequency with which particular works are performed. In contrast, DMX's on-premise data identifies which works were distributed, but not their relative frequency. DMX also offers "select" and "signature" service. Select service offers all or some of DMX's various channels sorted by musical category. Signature service involves music programming designed for the specific customer.

DMX's main BG/FG music industry competitors are Muzak LLC ("Muzak"), Music Choice, Inc. ("Music Choice"), PlayNetwork, Inc. ("PlayNetwork"), and Trusonic, Inc. ("Trusonic"). In recent years, music consultants who utilize digital media devices and online music services to create programming for businesses have also created increased competition in the BG/FB music industry. Increased industry competition and the national economic downturn have also reduced DMX's revenue and the fees that

it charges its customers.  From 2005 to 2010, DMX's average per-customer monthly revenue declined by 37 percent.  From 2008 to 2010, the rates DMX charged its customers declined by 25 percent.

In 2006, DMX began a direct licensing campaign, contracting directly with individual music composers and their publishers.  DMX pursued direct licenses, in part, to reduce the cost of business primarily associated with ASCAP and BMI's blanket licenses.  DMX hired Music Reports Incorporated, a company specializing in high-volume music license administration, to assist in the design and implementation of its direct licensing campaign.

By late 2010, DMX had signed 850 direct licenses, covering more than 7,000 separate music catalogs and hundreds of thousands of songs.  DMX's direct licenses typically provide each publisher with a pro rata share of an annual $25 per-location royalty pool.  This $25 amount represents all annual royalty payments attributable to each physical location at which a DMX program is performed.  Each publisher's pro rata share is calculated from its percentage

of plays on DMX's off-premise channels as a proxy for plays across DMX's entire service. DMX's direct licenses also include a "most-favored-nations clause" that ensures that each publisher's royalties are calculated using the same pro rata allocation methodology.

In 2007, DMX obtained a direct license from Sony/ATV Music Publishing ("Sony") -- one of the industry's largest music publishers -- that contained the same royalty allocation as all of DMX's other direct licenses: a pro rata share of the annual $25 per-location royalty pool. DMX believed that signing a major music publisher like Sony, or one of its competitors (Universal Music Publishing Group ("Universal"), EMI Music Publishing ("EMI"), or Warner-Chappell Music Publishing ("Warner-Chappell")), was necessary for a successful direct licensing program. DMX thus made substantial efforts to attract Sony, offering a royalty advance of $2.4 million and an administrative payment of $300,000. According to DMX, the advance was "the price to be paid if DMX was to break through the powerful status quo and pioneer a new licensing paradigm." Brief of

Applicant-Appellee (DMX) at 19, ASCAP v. DMX, No. 11-127-cv (2d Cir. April 29, 2011).  In 2009, DMX's license with Sony was extended through 2012.  Since 2007, DMX has continued to increase the frequency with which it plays Sony music.

### c. *ASCAP's Agreements with Other BG/FG Music Providers*

In 2005, ASCAP entered into a blanket license agreement with Muzak (the "ASCAP-Muzak Agreement"), the largest BG/FG music service provider in the United States. The ASCAP-Muzak Agreement provided that, from 2005 through 2009, Muzak would pay ASCAP a flat annual fee of approximately $6.8 million or an effective annual per-location fee of $41.21.[5]  The ASCAP-Muzak Agreement also provided that Muzak's annual fee would not increase if its subscriber base grew at an annual rate of 8 percent or less. If the annual growth rate of Muzak's subscriber base was greater than 8 percent, Muzak agreed to pay ASCAP an additional annual per-location fee of $41 for each location

---

[5]     The ASCAP-Muzak Agreement's annual per-location fee of $41.21 was calculated by dividing its flat annual fee by the number of Muzak's commercial subscriber locations.

in excess of the allotted 8 percent growth allowance. In effect, the ASCAP-Muzak Agreement's growth provision provided that if, over the course of its five-year license term, Muzak increased its subscriber base at an annual rate of precisely 8 percent, then Muzak's per-location annual fee would drop to $28.05, averaging $32.52 for the five-year term. Muzak also agreed to pay ASCAP a lump sum to settle all claims arising prior to 2005, including claims for past due royalties. On April 24, 2009, as a result of Muzak's lack of growth and then-pending bankruptcy, ASCAP agreed to reduce Muzak's annual fee.

ASCAP also entered into agreements similar to the Muzak-ASCAP Agreement with Music Choice, PlayNetwork, and Trusonic that covered varying time periods between 1999 and 2010. These agreements included annual per-location rates between $41 and $45. Under these agreements, Music Choice, PlayNetwork, and Trusonic also paid ASCAP substantial lump sums to resolve past disputes.

### d. *BMI's Agreements with Other BG/FG Music Providers*

From 1994 to 2004, Muzak paid BMI an annual per-location fee of approximately $12 to $14. In 2004, BMI and Muzak entered into a traditional blanket licensing agreement (the "BMI-Muzak Agreement") whereby Muzak agreed to pay BMI a base fee of $30 million over the five-year license period beginning in 2004 and ending in 2009. This five-year fee translated into an annual per-location fee of $36.36.[6] The BMI-Muzak Agreement took into account approximately $5 million that BMI alleged Muzak owed for retroactive license fees. Like the ASCAP-Muzak Agreement, the BMI-Muzak Agreement provided that Muzak's annual per-location fee would be maintained unless the number of Muzak locations grew at a rate greater than 8 percent per year. If Muzak grew at an annual rate of precisely 8 percent, Muzak could eventually obtain an annual per-location fee of $24.75.[7]

---

[6]  When BMI and Muzak entered into the BMI-Muzak Agreement, Muzak had 165,000 commercial subscriber locations. The annual per-location fee of $36.36 was thus calculated by dividing $30 million by 5 years and then by 165,000 locations.

[7]  This figure was calculated by dividing $30 million by 5 and then by 242,439. The 242,439 figure was calculated by

-15-

BMI offered the $36.36 rate and a license similar to the BMI-Muzak Agreement to DMX's other competitors; PlayNetwork and Trusonic accepted BMI's offer.

## 2. *Proceedings Below*

### a. *ASCAP v. DMX*

On June 3, 2005, DMX requested an "adjustable-fee blanket license" ("AFBL"), or a "blanket license with a carve-out," from ASCAP. An AFBL is essentially a blanket fee reduced to account for music directly licensed from music publishers and owners that also appear within the PRO's repertoire. *BMI v. DMX,* 726 F. Supp. 2d. 355, 355 (S.D.N.Y. 2010). ASCAP and DMX, however, could not agree on a license fee. On July 25, 2006, pursuant to the AFJ2, ASCAP applied to the district court (the "*ASCAP* rate court") to set a reasonable rate for DMX's requested license. ASCAP presented two fee proposals to the *ASCAP* rate court and

increasing Muzak's 165,000 commercial subscriber locations by 8 percent each year over the course of 5 years, representing the number of projected commercial subscriber locations Muzak would have if it continued to grow at 8 percent over 5 years.

maintained that a blanket license with a carve-out for direct licensing was not a reasonable fee structure.

First, ASCAP proposed a blanket license with no carve-out for DMX's direct licensing program. This first proposal offered a flat fee calculated by multiplying an annual per-location rate by the number of locations and then by the number of years of the license. ASCAP argued that this proposal was proportionate to the fees Muzak agreed to pay ASCAP.

Specifically, for the period beginning June 5, 2005 and ending December 31, 2009, ASCAP proposed a flat fee of $15,677,777 for all performances of all works in the ASCAP repertory. ASCAP calculated this figure by multiplying the annual per-location rate used in the ASCAP-Muzak Agreement ($41.21) by 83,000, the number of DMX customer locations in 2005, and then by 4 and 7/12 years, the length of the period from June 5, 2005 to December 31, 2009. In addition, for the period from 2010 through 2012, ASCAP proposed an annual per-location rate of $49, to be adjusted for inflation. To arrive at this rate, ASCAP

divided the annual flat fee of $3,420,606 by 69,000, the number of DMX customer locations in 2009.

Second, in the alternative, ASCAP proposed a "blanket license with a static credit," or "carve-out," based on the fees Muzak agreed to pay ASCAP and on a portion of the payments DMX made to its direct licensors in 2009. ASCAP's second proposal offered the same flat fee proposed in the first option, reduced by a discount and then increased by an administrative fee. Under this proposal, ASCAP's suggested flat fee of $15,677,777 or $3,420,606 per year would be reduced by a credit for payments that DMX made to ASCAP members for performances of their works licensed through direct licenses. The credit was calculated by reducing the amount DMX paid for directly-licensed music first by 10 percent to account for the portion of those payments intended to compensate publishers for mechanical rights, and second by an additional 50 percent to identify those royalties that were paid to publishers for compositions not within the ASCAP repertory. The credit, however, would be offset by an additional administration

charge of $25,000 per year for expenses that ASCAP would incur in implementing the carve-out license. Because DMX did not begin its direct license program until 2006, the administrative fees would be applicable only from 2007 through 2009. Accordingly, ASCAP's total proposed license fee of $15,410,096 constituted the blanket rate of $15,677,777, reduced by the carve-out-credit and the administrative fee of $75,000 for the applicable three-year period.

Further, for the 2010 through 2012 period, ASCAP proposed the same blanket rate as its first proposal -- $49 per-location, adjusted for inflation -- in addition to the $25,000 yearly administrative charge. For this period, under ASCAP's second proposal, DMX would receive an annual $230,000 credit, adjusted for inflation, to account for the amount of royalties DMX paid its direct licensors in 2009; fluctuations in DMX's direct licensing would not affect its credit.

DMX contended that ASCAP's agreements with other BG/FG providers did not reflect the competitive market and,

for the years following 2009, counter-proposed a blanket license with a carve-out incorporating the extent to which it relied on direct licenses. DMX's proposal involved: (1) a "floor fee" reflecting the minimum amount that DMX would be obligated to pay ASCAP even if all of the ASCAP-affiliated music that DMX performed was directly licensed; (2) an "unbundled music fee," or the "pure" value of the performance rights for ASCAP music performed by DMX; and (3) the share of all DMX performances of ASCAP-affiliated music licensed to DMX solely by ASCAP (the "share licensed via ASCAP"). Combined, the floor fee and the unbundled music fee equaled the blanket fee, or the maximum amount to which ASCAP would be entitled under DMX's proposal.

DMX contemplated the following rate formula: the sum of the floor fee plus the unbundled music fee multiplied by the share licensed via ASCAP.[8] By multiplying the

---

[8] DMX's proposed rate formula can also be described as the product of the difference between the blanket fee and the floor fee multiplied by the difference between 1 and the share licensed via ASCAP and then subtracted from the blanket fee. One minus the share licensed via ASCAP is equivalent to dividing the total number of ASCAP works transmitted by DMX for which DMX has a direct license by the total number of ASCAP works transmitted

-20-

unbundled music fee and the share licensed via ASCAP, DMX would pay ASCAP an amount that varied depending on the extent to which DMX subscribers actually played ASCAP works that were also directly licensed.

Specifically, DMX proposed a floor fee of $3 per location and an unbundled music fee of $10.74 per location. DMX, drawing from ASCAP's records, contended that the $3 floor fee represented the combination of $2.14 for expenses specific to BG/FG music service and $0.86 for general overhead expenses. DMX calculated the $10.74 unbundled music fee first by reducing the annual $25 per-location royalty pool from the direct license agreements by 10 percent to account for the direct license agreements' grant of mechanical and public performance rights. DMX then further reduced the resulting $22.50 per-location fee to reflect ASCAP's 48 percent share of total performances on the DMX network.

On December 1, 2010, following a five-day bench trial, the *ASCAP* rate court (Cote, *J.*) issued an opinion and

by DMX.

order adopting DMX's proposal to set the final rate. *In re Application of THP Capstar Acquisition Corp.*, 756 F. Supp. 2d 516 (S.D.N.Y. 2010) ("*ASCAP*"). The court rejected ASCAP's first proposal because it found that the Muzak Agreement was "not a reliable benchmark." *Id.* at 543. Specifically, the *ASCAP* rate court found that: (1) the 2005-2009 license on which ASCAP relied was only one part of a much larger transaction settling existing disputes and resolving issues relating to an eleven-year period; (2) "it is dangerous to rely on a per[-]location fee" extrapolated from the starting point of a flat fee deal that allowed expected growth in locations and contemplated a possible decline in the effective rate from $41.21 to $28.05 over the license term; (3) DMX refused to enter a license premised on the same formula; and (4) economic conditions in the industry had changed since ASCAP and Muzak entered into their agreement. *Id.* at 539-43. With respect to ASCAP's second proposal, the *ASCAP* rate court found that: (1) ASCAP failed to show that a $41.21 rate for the pre-2010 period or a $49 rate for 2010 was an "appropriate base from which to

construct the blanket rate"; (2) ASCAP's proposed flat fee for 2006-2009 did not account for DMX's substantial loss of customer locations during that period; (3) the "dollar-for-dollar" carve-out-credit ASCAP proposed did not reasonably reflect DMX's direct license initiative, would discourage DMX from continuing with its direct licensing program, and represented a windfall to ASCAP members who did not directly contract with DMX; and (4) ASCAP failed to provide sufficient evidence to support its proposed $25,000 annual surcharge for administering the credits. *Id.* at 542-43.

On December 20, 2010, the *ASCAP* rate court entered judgment setting the specific terms of the rate. Adopting DMX's proposal, the *ASCAP* rate court set a floor fee of $3, a blanket fee of $13.74, and an unbundled music fee of $10.74.[9] The resulting annual per-location fee was set at $13.74 (the blanket fee) minus the product of $10.74 (the unbundled music fee) and a direct license ratio of 48 percent. The direct license ratio was set as the total

_____

[9] The floor fee was calculated by subtracting the unbundled music fee from the blanket fee.

number of ASCAP works transmitted by DMX's off-premise service for which DMX has a direct license with at least one publisher of the work (pro-rated to reflect the ownership shares of the directly-licensed ASCAP-affiliated publisher), divided by the total number of ASCAP works transmitted by DMX's off-premise service (pro-rated to reflect the share of the song's ownership affiliated with ASCAP).

**b.** ***BMI v. DMX***

On June 3, 2005, DMX requested an AFBL from BMI. The parties commenced negotiations but were unable to reach agreement. On January 10, 2008, BMI petitioned the district court (the "*BMI* rate court") to determine a reasonable fee. BMI did not dispute DMX's entitlement to an AFBL. DMX and BMI agreed that the AFBL fee should include: (1) a full blanket rate, or the amount DMX would pay if it used no directly-licensed BMI music; (2) a floor fee that DMX would pay even if it directly licensed all the BMI music it used; and (3) a crediting mechanism for calculating DMX's discount off the full blanket fee for each directly-licensed music

-24-

performance.  The parties, however, disagreed as to how to value these components.

BMI proposed a rate with a blanket fee calculation based on the blanket license agreement it first entered into with Muzak (the "BMI-Muzak Agreement") -- and later made with other BG/FG providers -- for the 2004-2009 period.  BMI proposed a total blanket fee of $41.81 per location.  To arrive at this fee, BMI increased its proposed annual per-location fee of $36.36 by 15 percent to account for the additional costs of an AFBL and the "option value" the AFBL provides over the traditional blanket license.

DMX proposed a blanket license rate with BMI that incorporated its direct licensing program into its proposed fee structure; this proposal was nearly identical to the one DMX proposed in *ASCAP*.  Specifically, DMX proposed a blanket fee of $11.32 per location, representing an unbundled music fee for the rights to perform the works in BMI's repertoire and a floor fee to compensate BMI for the value of its services and the benefits of a blanket license.  DMX, referencing approximately 550 direct licenses with music

publishers as benchmarks, proposed a share of an annual $25 per-location royalty pool equivalent to $10 -- 40 percent of $25 -- to represent the portion of DMX's music performances drawn exclusively from BMI's repertoire.

On July 26, 2010, following a ten-day bench trial, the *BMI* rate court (Stanton, *J.*) rejected the BMI-Muzak Agreement as a benchmark for the value of DMX's AFBL. *BMI*, 726 F. Supp. 2d at 359. The court adopted DMX's proposal and entered judgment setting a final annual per-location blanket fee of $18.91, an annual per-location floor fee of $8.66,[10] and a direct licensing ratio to be calculated using DMX's off-premise performances as a proxy for all of its performances. *Id.* at 364.

These appeals followed.

### *DISCUSSION*

On appeal, ASCAP and BMI principally argue that the district court in both cases set an unreasonable fee for

---

[10]     The floor fee included three components:  (1) $6.18 in overhead costs, equal to 17 percent of BMI's per-location income of $36.36; (2) $2.38 in routine costs per location; and (3) $0.10 in initial development costs.  *Id.* at 364.

their respective licenses with DMX by incorporating the extent to which DMX relied on direct licenses.  First, ASCAP argues that direct licenses should not be factored into its licensing rate structure with DMX because a rate structure with an adjustable carve-out for direct licenses conflicts with the AFJ2 and is unreasonable.[11]  Second, ASCAP, in the alternative, and BMI both argue that direct licenses should only be marginally incorporated into their licensing fee structures with DMX.  They argue that the district court in both cases erred by using DMX's direct licensing agreements with music publishers as benchmarks for their respective licensing fees and that their licenses with DMX's competitors should have been adopted as benchmarks because they were more accurate valuations of their services and more indicative of the "competitive market."

We first discuss ASCAP's contention that a rate structure with an adjustable carve-out conflicts with the AFJ2; we then discuss the district court's rejection of

---

[11]    BMI did not dispute -- in the rate court proceeding or on appeal -- that DMX was entitled to a blanket license with a carve-out.  *Id.* at 355-56.

ASCAP and BMI's proposals and the reasonableness of the rates set by the district court.

## I. *The AFJ2*

ASCAP contends that a rate structure with an adjustable carve-out conflicts with the AFJ2. ASCAP argues, *inter alia*, that by defining certain licenses and not defining a blanket license with an adjustable carve-out, the AFJ2 excludes the latter. The *ASCAP* rate court rejected this argument.

Consent decrees are construed "basically as contracts." *AEI*, 275 F.3d at 175 (internal citations and quotation marks omitted). When the language of a consent decree is unambiguous, deference is paid to the plain meaning of the decree's language. *Id.* The decree's scope must be discerned within its four corners, and not with respect to what might satisfy one of the parties' purposes. *Id.* When the language of a decree is ambiguous, however, a court may consider, *inter alia*, extrinsic evidence to determine the parties' intent, including the purpose of the provision and the overall context of the decree. *Id.* We

-28-

review the district court's interpretation of a consent decree *de novo* and its factual findings for clear error. *Id.*

The AFJ2 defines four types of licenses: blanket, per-program, per-segment, and through-to-the-audience licenses. *See supra* note 3 and accompanying text. In addition, section V of the AFJ2 discusses "Through-to-the-Audience Licenses," section VI discusses "Licensing," and section VII discusses "Per-Program and Per-Segment Licenses." *See* AFJ2 §§ V, VI, VII. Section VII(C) provides: "Nothing in th[e AFJ2] shall prevent ASCAP and any music user from agreeing on any other form of license." AFJ2, § VII(C). Thus, although the AFJ2 defines types of licenses that ASCAP could provide to DMX, on its face, the AFJ2 plainly permits other forms of licenses and does not preclude blanket licenses with adjustable carve-outs.

Although we did not expressly address this issue in *AEI*, BMI raised a similar argument in that case. *AEI*, 275 F.3d at 176. There, we explained that a request for a blanket license subject to a carve-out constitutes "a

request not for a new type of license, but for a blanket license with a different fee basis, over which the district court has rate-setting authority and which [the PRO] must offer."  *Id.* at 171, 175-77; *see also United States v. ASCAP*, 309 F. Supp. 2d 566, 581 (S.D.N.Y. 2004) ("*Muzak*") (concluding that "the present AFJ2 may be construed to permit the issuance of a blanket license with a fee structure that reflects direct licensing arrangements previously entered into by applicants" and "the existence of such direct licensing relationships may and will be considered by this Court in a rate court proceeding").  We rejected the contention, then advanced by BMI, that the BMI Decree "applie[d] only to those licenses specifically mentioned in the BMI Decree, and to the traditional blanket license with its traditional per premise fee structure." *AEI*, 275 F.3d at 176.  Our reasoning in *AEI* applies with equal force here.

Accordingly, the district court correctly rejected ASCAP's contention that the AFJ2 does not permit a rate

structure that features an adjustable carve-out.  As the

*ASCAP* rate court correctly determined:

> [The AFJ2] is an antitrust consent decree providing a mechanism for the setting of reasonable license fees in a unique market in which ASCAP indisputably exercises market power.  While ASCAP may be unwilling to offer a blanket license with a carve-out for a direct licensing program, the terms of AFJ2, the decisions interpreting and applying AFJ2, and the record evidence from this trial each indicate that such a license is appropriate and justified here.

*ASCAP*, 756 F. Supp. 2d at 541.  We thus hold that the AFJ2

permits blanket licenses subject to carve-outs to account

for direct licensing, and we reject ASCAP's claim that a

blanket license with an adjustable carve-out conflicts with

the AJF2.

## II.  *The Rates*

### A.  *Applicable Law*

Under the AFJ2 and the BMI Decree, ASCAP and BMI

are required "to grant to any music user making a written

request therefor a non-exclusive license to perform all of

the works in the ASCAP repertory."  AFJ2, § VI; *see* BMI

-31-

Decree, § IV(A).[12]  If the parties are unable to reach

agreement, after prescribed periods of negotiations, either

party may apply to the district court for a determination of

a reasonable fee.  AFJ2, § IX(A); *see* BMI Decree, §

XIV(A).[13]  In these rate court proceedings, the burden of

---

[12]    The BMI Decree provides that BMI is "enjoined and restrained from:  (A) Failing to grant permission, on the written request of all writers and publishers of a musical composition including the copyright proprietor thereof, allowing such persons to issue to a music user making direct performances to the public a non-exclusive license permitting the making of specified performances of such musical composition by such music user directly to the public, provided that the defendant shall not be required to make payment with respect to performances so licensed."  BMI Decree, § IV(A).

[13]    The AFJ2 provides:

> If the parties are unable to reach agreement within sixty (60) days from the date when the request for a license is received by ASCAP, or within sixty (60) days of ASCAP's request for information, whichever is later, the music user may apply to the Court for a determination of a reasonable fee retroactive to the date of the written request for a license . . . . If the parties are unable to agree upon a reasonable fee within ninety (90) days from the date when ASCAP advises the music user of the fee that it deems reasonable or requests additional information from the music user, and if the music user has not applied to the Court for a determination of a reasonable fee, ASCAP may apply to the Court for the determination of a reasonable fee . . . .

AFJ2, § IX(A).

proof is on the PRO to establish the reasonableness of the fee it seeks.  AFJ2, § IX(B); *see* BMI Decree, § XIV(A).[14] If the PRO establishes that its requested rate is reasonable, then the district court shall adopt it.  *See* AFJ2, § IX(D); BMI Decree, § XIV(A).[15]  If the PRO is unable

The BMI Decree similarly provides:

> If the parties are unable to agree upon a reasonable fee within sixty (60) days from the date when defendant advises the applicant of the fee which it deems reasonable, the applicant may forthwith apply to this Court for the determination of a reasonable fee . . . . If the parties are unable to agree upon a reasonable fee within ninety (90) days from the date when defendant advises the applicant of the fee which it deems reasonable and no such filing by applicant for the determination of a reasonable fee for the license requested is pending, then defendant may forthwith apply to this Court for the determination of a reasonable fee. . . .

BMI Decree, § XIV(A).

[14]    The AFJ2 provides:  "In any such proceeding, the burden of proof shall be on ASCAP to establish the reasonableness of the fee it seeks. . . ."  AFJ2, § IX(B).

The BMI Decree provides:  "In any such proceeding, defendant shall have the burden of proof to establish the reasonableness of the fee requested by it."  BMI Decree, § XIV(A).

[15]    The AFJ2 provides:  "Should ASCAP not establish that the fee it requested is reasonable, then the Court shall determine a reasonable fee based upon all the evidence."  AFJ2, § IX(D).

to establish that its requested rate is reasonable, then the rate court shall determine a reasonable fee based on all the evidence, including a proposal from the music user.  AFJ2, § IX(D); *see* BMI Decree, § XIV(A).

We review rates set by the district court for reasonableness.  *United States v. BMI*, 426 F.3d 91, 96 (2d Cir. 2005) ("*Music Choice*").  "Fundamental to the concept of 'reasonableness' is a determination of what an applicant would pay in a competitive market, taking into account the fact that [the PRO], as a monopolist, 'exercise[s] disproportionate power over the market for music rights.'" *United States v. ASCAP*, 627 F.3d 64, 76 (2d Cir. 2010) ("*RealNetworks*") (quoting *Music Choice*, 426 F.3d at 91). Benchmarks, or agreements reached after arms' length negotiation between other similar parties in the industry, are often used by the rate court in determining the fair market value of the music.  *See id*.  In assessing whether

---

The BMI Decree provides:  "Should defendant not establish that the fee requested by it is a reasonable one, then the Court shall determine a reasonable fee based upon all the evidence."  BMI Decree, § XIV(A).

another agreement provides a valid benchmark, the district court must consider whether the other agreement dealt with a comparable right, whether it involved similar parties in similar economic circumstances, and whether it arose in a sufficiently competitive market. *See Music Choice*, 426 F.3d at 95.

We review for clear error the district court's findings of fact relating to the benchmark agreements, including whether they were formed in a freely competitive market. *See id.* at 96 (benchmarks); *ASCAP v. Showtime/The Movie Channel, Inc.*, 912 F.2d 563, 569 (2d Cir. 1990) (freely competitive market). Adjustments to the benchmark "to best approximate the fair market value of the music may be based on factual findings, but also may contain legal conclusions that we review *de novo*." *Music Choice*, 426 F.3d at 96.

## B. *Application*

Under the AFJ2 and the BMI Decree, the district court, in both cases, had the authority to set a reasonable rate for DMX's licenses with ASCAP and BMI if ASCAP and BMI

did not satisfy their burden of proving that their proposals were reasonable. *See* AFJ2, § IX(B); BMI Decree, § XIV(A). For the reasons set forth below, we hold that it was not clearly erroneous for the *ASCAP* and *BMI* rate courts to find that the ASCAP-Muzak and BMI-Muzak Agreements (together, the "Muzak Agreements") did not reflect rates that would be set in a competitive market. *See Music Choice*, 426 F.3d at 96. We also hold that, in both cases, the district court reasonably rejected ASCAP and BMI's proposals and adopted DMX's recommended benchmarks to set the licensing fees. *See id.* Finally, we hold that rate courts can take direct licenses into account in setting rates between commercial music service providers and PROs. We first discuss the district court's rejection of ASCAP and BMI's proposals; we then discuss the reasonableness of the rates set by the rate courts.

### i. *ASCAP and BMI's Proposed Benchmarks*

The district court reasonably rejected ASCAP and BMI's benchmarks in both cases. Although Muzak and DMX are both commercial music service providers and the Muzak

Agreements involved rights comparable to those at issue in this case (the right to public performance), Muzak and DMX's respective market positions and the economic circumstances surrounding their negotiations with ASCAP and BMI differ markedly. The rate courts did not err, much less clearly err, in holding that the Muzak Agreements did not involve similar parties in similar economic circumstances and did not reflect rates that would arise in a sufficiently competitive market. *See id.* at 95. In both cases, the district court, after making detailed findings of fact and carefully considering the issues, properly rejected ASCAP and BMI's overall proposals as unreasonable because they did not reflect rates that would be set in a competitive market. *See id.*

First, ASCAP and BMI's proposed benchmarks did not account for DMX's substantial and growing direct licensing program -- an economic circumstance that distinguishes DMX's position from that of Muzak. Indeed, ASCAP's first proposal would have charged a flat fee for the first four years and seven months of the license and an annual per-location fee

for the remaining two years of the license period. ASCAP's second proposal of a "blanket license with a static carve-out" used the same per-location annual fee as the first proposal, reduced by a credit equal to a fraction of the amount that DMX paid for directly-licensed music, plus an annual blanket administrative fee of $25,000. Finally, BMI proposed an annual per-location blanket fee of $41.81 based upon its five-year, $30 million license fee with Muzak. If DMX's licensing rates with ASCAP and BMI did not meaningfully account for its direct licenses, DMX would effectively pay twice for musical works covered by a PRO and its direct licensing program. These facts, however, were not factored into ASCAP's first proposal or BMI's only proposal, and their inclusion into ASCAP's second proposal was effectively negligible.

Second, as the district court found in both cases, ASCAP and BMI failed to show that the rates in their respective agreements with Muzak excluded additional costs -- such as, for example, the resolution of audit and back-pay disputes, and the incorporation of growth allowances --

independent of the value of ASCAP and BMI's grants to perform their members' copyrighted music. Indeed, ASCAP and BMI's proposals were extrapolated from agreements with Muzak for nearly $35 and $30 million that spanned the course of five years. ASCAP and BMI's proposals then winnowed down these lump sums by Muzak's average number of locations to arrive at annual per-location rates of $41.21 and $36.36 -- rates that were respectively proposed to increase to $49 to account for time and inflation and to $41.81 to account for the "option value" of an AFBL over a traditional blanket license. Additionally, the Muzak Agreements contained growth terms that had the potential to reduce Muzak's projected costs over the period of the license term, and both agreements resolved claims that either party could have had against the other prior to the agreement date, unless, in BMI's case, rate court proceedings were initiated. Thus, based on the evidence presented at trial, the district court, in both instances, reasonably found that ASCAP and BMI's respective rates with Muzak accounted for more than per-location licensing fees.

Finally, the district court also found that ASCAP and BMI's benchmarks did not reflect a sufficiently competitive market and their proposals therefore did not reflect rates that would be set in a competitive market. *See id.* In both instances, the district court was entitled to find that the Muzak Agreements, upon which ASCAP and BMI's proposals were based, were less competitively set than they would have been if Muzak regularly used direct licensing or if music rights were more "scattered among numerous performing rights societies." *Showtime*, 912 F.2d at 570. With respect to ASCAP's second proposal, based on the testimony of ASCAP's Chief Economist, it was not clearly erroneous for the district court to find that a static carve-out structure was anti-competitive and "inequitable" because it would effectively require DMX to pay more in total licensing fees and create incentives for DMX to abandon its direct licensing campaign. *See ASCAP*, 756 F. Supp. 2d at 544-45. With respect to BMI, based on the evidence presented at trial, it was not clearly erroneous for the district court to conclude that DMX's competitors

"had no realistic opportunity freely to negotiate the future fees for their licenses." *BMI*, 726 F. Supp. 2d at 359. As the *BMI* rate court found, commercial music service providers who refused BMI's $36.36 rate and form license and proceeded to rate court faced the risk of retroactive payment claims from BMI because BMI had expressly reserved its right to seek such payments in any rate court proceeding. *Id.*

Accordingly, the district court in both cases reasonably found that ASCAP and BMI did not sustain their burdens of proving that their proposals were reasonable. No legal error contributed to these findings, and the findings, supported by the record, were not clearly erroneous. *See Showtime*, 912 F.2d at 571. In both instances, the district court thus had the authority to set a reasonable rate for DMX's licenses.

### ii. *The Rates Set By the District Court*

The *ASCAP* and *BMI* rate courts essentially set rates comparable to DMX's direct license rates while providing an additional floor fee that guaranteed some compensation to ASCAP and BMI regardless of the extent to

which DMX used their repertory.  The rates set by the *ASCAP* and *BMI* rate courts and the use of DMX's direct licenses as benchmarks were reasonable for the following reasons.

First, the rates set by the district court reasonably compensated ASCAP and BMI for their services.  As the *ASCAP* rate court found:  "[DMX's] proposal acknowledges that [PROs] provide[] important services to both its members and to music users."  *ASCAP*, 756 F. Supp. 2d at 549.  Indeed, the floor fee established by both the *ASCAP* and *BMI* rate courts compensated ASCAP and BMI for their licensing and overhead costs; the floor fee established by the *ASCAP* rate court was based on ASCAP's own records.  Inclusion of the floor fee into the fee structure also ensured that ASCAP and BMI would be compensated for the value of their services regardless of the extent to which DMX played ASCAP or BMI works that were also directly licensed.  That the rates set by the *ASCAP* and *BMI* rate courts were comparatively lower than those historically obtained by ASCAP and BMI is of no moment given ASCAP and BMI's longstanding market power and the industry's changing economic landscape.

Second, the annual $25 per-location royalty pool was not an unreasonable benchmark for DMX's per-location licensing fees with ASCAP and BMI. It reflected the competitive market, was an appropriate valuation of the right to publicly perform the licensed musical works, and was consistent with the four factors that guide the selection of a benchmark (a comparable right, similar parties, similar economic circumstances, and whether the rate would be set in a sufficiently competitive market). *See Music Choice*, 426 F.3d at 95. The right in question -- the right to public performance -- was comparable. The parties were also similarly situated. Hundreds of music publishers and administrators agreed to the annual $25 per-location royalty pool, and thus, the *ASCAP* rate court did not err in finding that the "collective decisions [of hundreds of publishers and administrators] to execute direct licenses [were] comparable to the decision [a PRO] makes in entering a license." *ASCAP*, 756 F. Supp. 2d at 550. While the economic circumstances of direct licensors differ from those of ASCAP and BMI, these differences were balanced by

the additional compensation that PROs received under the district court's rate formulas and "the degree of competition that the direct licenses inject into th[e] marketplace." *Id.* Accordingly, in both cases, the district court did not err in finding that, for rights to publicly perform licensed musical works, direct licenses were more reflective of rates that would be set in a competitive market than blanket fees imposed by PROs on BG/FG music providers.

Third, based on the evidence presented at trial, it was not clearly erroneous for the *ASCAP* and *BMI* rate courts to find that DMX's advance to Sony was a "cost of entry into the market" that DMX paid to sign at least one major music publisher into its new direct licensing program. *See id.* at 551-52; *BMI*, 726 F. Supp. 2d at 361. To support this finding, the *ASCAP* rate court explained that the Sony agreement with DMX was confidential and there was no evidence that any other direct licensor found the advance to be surprising, demanded a similar advance, or contended that

the annual $25 per-location royalty pool should be increased to account for the advance. *ASCAP*, 756 F. Supp. 2d at 552.

Fourth, in light of the evolving commercial music market, the rate courts reasonably incorporated direct licenses to the extent they are relied upon by licensees like DMX. Direct licenses, and their incorporation into licensing fee structures, foster fair pricing and competition within the music licensing market, thereby advancing the very purpose of the AFJ2 and the BMI Decree. The rates set by the district court, as the *ASCAP* court found, "allow[] the appropriate incentives for DMX to continue and to expand its direct licensing program." *Id.* at 549. We have already noted that if the *ASCAP* and *BMI* rate courts had not taken DMX's direct licenses into account, DMX would have had to pay twice to use the same musical works, and, more substantially, direct licensing within the commercial music industry would be discouraged.

The AFJ2 and the BMI Decree were established as a result of the government's antitrust challenges to ASCAP and BMI's licensing practices. Their purpose was to, in part,

promote free competition in the music licensing industry and minimize the "danger of unreasonable activity" resulting from ASCAP and BMI's market power and potential restraints on trade. *See K-91*, 372 F.2d at 4; *accord Showtime*, 912 F.2d at 570. The rate court mechanism must be considered within this context. *See Showtime*, 912 F.2d at 570. The ability of users of music rights to avail themselves of a reasonable rate through the rate court mechanism when ASCAP and BMI's market power might otherwise subject them to unreasonably high fees "would have little meaning if that court were obliged to set a 'reasonable' fee solely or even primarily on the basis of the fees [a PRO] had successfully obtained from other users." *Id*. "The disinfectant [of the rate courts] need not be a placebo." *Id*.

Accordingly, we hold that the district court did not err in setting DMX's licensing rates with ASCAP and BMI and that the rates set by the district court were reasonable.

## *CONCLUSION*

For the reasons set forth above, we AFFIRM the judgments of the district court.